[No. 36747. En Banc. April 2, 1964.]

MORRISON-KNUDSEN COMPANY, INC., et al., Respondents, v. THE STATE OF WASHINGTON, Appellant.*

The Attorney General, John W. Riley, Special Assistant, and Henry W. Wager, Assistant, for appellant.

Allen, DeGarmo & Leedy, by Gerald DeGarmo, for respondents.

ROSELLINI, J.—This action was brought by the respondents as an appeal from two orders of the State Tax Commission, denying a refund of business and occupation taxes and use taxes paid to the appellant and accruing during the

*Reported in 390 P. (2d) 712.

period of December 11, 1957, to September 30, 1959. The taxes involved were:

(1) Business and occupation taxes for manufacturing activities. This tax was to be measured by the value of 23 pontoons, 44 anchor shells, and two steel transition spans which the appellant contended were prefabricated or manufactured by the respondents and then incorporated into the Hood Canal Bridge; and

(2) Use taxes, measured by the value of the articles so prefabricated or manufactured by the respondents and subsequently used in completion of the respondents' contract with the Washington Toll Bridge Authority for construction of the Hood Canal Bridge.

The respondents complained that they were not liable for the taxes because they were not engaged in manufacturing activities, they did not "use" the pontoons and anchor shells as "consumers," and the pontoons and anchor shells had no value for excise tax purposes.

The trial court sustained the first two of these three contentions and did not pass upon the third.

Briefly stated, the evidence showed that the respondents who were equipped to construct the floating sections of the Hood Canal Bridge according to the contract specifications and to assemble and anchor the same at the bridge site, entered into a joint venture for the purpose of undertaking the construction of the bridge. They were awarded the contract and paid a business and occupation tax based on the gross proceeds of the contract under the provisions of RCW 82.04.280.

The prefabricating of the pontoons and anchor shells was done at the respondents' dry dock and graving yard in Seattle, on the Duwamish River. When the basic hulls of the pontoons were completed in dry dock, they were launched and floated to the graving yard. At the graving yard, a variety of operations were conducted to prepare each pontoon for eventual use in the bridge structure. Some required installation of elevated roadbeds. Each required, among other things, installation of electrical conduits and preparation for installation of railings.

The construction of the 44 floating anchor shells was also accomplished in the floating dry dock. Each anchor shell was constructed of concrete reinforced by honeycombs of steel. The steel transition spans, the value of which was included in the assessment base, were also assembled in Seattle, although in this case the assembly was accomplished by a subcontractor.

After the anchor shells were completed, they were floated out of dry dock and were towed as a barge to Port Gamble where they were "beached" and flooded for storage. They were stored by the respondents for periods of up to 2 years. The anchor shells were constructed at Seattle in anticipation of further modification at Port Gamble and the bridge site just prior to their incorporation into the bridge structure. Floated into position over a carefully prepared underwater location, each anchor was rigged by cable to the bridge and while held in position, was filled with concrete, and then guided to its final underwater resting place.

At the Duwamish River location, the respondents proceeded to manufacture the pontoons to the stage of completion required by the design specifications. The pontoons were then floated and towed to a storage yard at Idaho Street in Seattle where they were stored for periods up to 2 years. They were then towed to Port Gamble Bay about 1½ miles from the bridge site, where they were again stored for a period while additional work was done thereon.

After the partial construction at Seattle of pontoons "L" and "M," which were a part of the draw pontoons, they were towed to the yard of the National Steel Company on the Duwamish River in Seattle, where they were used as a floating platform for prefabrication of the steel transition spans. After the spans were assembled on the decks of pontoons "L" and "M," the pontoons served as barges for movement of the spans to the bridge site. After placement of the transition spans, pontoons "L" and "M" were returned to Seattle for completion according to design specifications.

At Port Gamble Bay units of two or three pontoons were joined together by various operations, including bolting,

cementing, and grouting. The units were then floated to the bridge site for additional jointing, connections, and placement of cables. When about half of the bridge was in place, severe storms occurred, which disclosed that the bridge as designed was inadequate to stand up to the rigors of tidal and storm action of Hood Canal. Damage had been done to units of the bridge that had been put in place. Accordingly, it became necessary to remove six pontoons which had been placed, for modification and strengthening before reinstalling them in the bridge structure.

The Washington Toll Bridge Authority then issued a call for bids for this work and for the repairing of storm damage. Yuba Erectors was the successful bidder and it eventually completed the final assembly of the bridge. The respondents' contract was terminated by mutual consent.

The Tax Commission assessed business and occupation taxes against the respondents, based upon the activity of manufacturing and using the pontoons and anchor shells, measured by the cost of manufacturing those items at Seattle, away from the bridge site.

The theory of the Tax Commission assessment was that the respondents' Seattle operations were a separate activity taxable just as though the taxpayer had subcontracted the construction of the pontoons and anchor shells to an independent subcontractor.

The trial court held that the shells and pontoons were not "manufactured," within the meaning and intent of RCW 82.04.110, -120, -130, and -240 and were not "used" or "consumed" by the respondents as a public road contractor, within the meaning and intent of RCW 82.04.190.

Error is assigned to these findings and the conclusions of law and judgment based thereon.

A business and occupation tax is levied upon every person who engages in business activities, under RCW 82.04.220. This tax is expressly levied upon manufacturers in RCW 82.04.240, which provides that the amount of the tax with respect to such business shall be equal to the value of the products, including byproducts, manufactured, multiplied by the rate of one-quarter of one per cent.

The term "manufacturer" is defined in RCW 82.04.110 as follows:

" 'Manufacturer' means every person who . . . manufactures . . . for commercial or industrial use from his own materials or ingredients any articles, substances or commodities. . . ."

The term "to manufacture" is defined in RCW 82.04.120 as embracing

" . . . all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful substance or article of tangible personal property is produced for sale or commercial or industrial use, and shall include the production or fabrication of special made or custom made articles."

Although the shells and pontoons were huge articles, they were nevertheless "articles of tangible personal property," when they were manufactured or fabricated at the Seattle dry docks and graving yard; and they were the result of the application of labor and skill to materials to produce new, different, and useful articles.

The trial court seems to have been impressed by the fact that additional work remained to be done upon these articles before their final installation as parts of the bridge. This fact, however, did not make them any the less "new" and "different" or render them useless. They had reached the stage of completion required by the contract when they left the Seattle dry docks and were useful for the purpose for which they were constructed, even though modifications and other additional work were required before their final installation.

The respondents argue that these items were "constructed" rather than "manufactured," and that the term "to manufacture" implies the making of a product salable in ordinary commerce. The statutory definition does not so limit the term. We may concede that there are construction activities which are not "manufacturing." Road building, for example, is not "manufacturing" because it does not result in the production of an "article of tangible

personal property," but rather the improvement of real property. But the constructing of new, different, or useful articles of tangible *personal* property is "manufacturing," as defined by the statute. The respondents do not suggest that the items in question here were real property. The statute does not confine the definition of manufactured articles to those made for commercial use, but includes those intended for industrial use, and expressly applies to the manufacturing of special or custom-made articles.

Nor does the statute limit the taxable activities to those resulting in the production of "finished" products, and we cannot assume that it was the intent of the legislature that only such activities should be taxed, as this would result in the exemption of a very large segment of the manufacturing community, the makers of "parts." Thus, if every part of a clock were manufactured by a different person, only the one who finally assembled the parts would be taxed. We would then be greeted with a storm of protest that the tax was grossly discriminatory.

Under the plain language of the statute, if the activity of the taxpayer results in an article of tangible personal property which is new, different, or useful, it is taxable. The anchor shells, pontoons, and transition spans fell within each of these descriptions.

We conclude that the trial court was in error when it held the manufacturer's tax inapplicable.

The trial court also found that the respondents did not use the items in question, as a consumer, within the meaning and intent of RCW 82.04.190. This section defines the word "consumer," in pertinent part, as follows:

"(3) Any person engaged in the business of contracting for the building, repairing or improving of any publicly owned street, place, road, highway, bridge or trestle which is used or to be used primarily for foot or vehicular traffic as defined in RCW 82.04.280, in respect, however, only to tangible personal property used or consumed in such business;"

The compensating or "use" tax is levied in RCW 82.12.020, which provides:

"There is hereby levied and there shall be collected from

every person in this state a tax or excise for the privilege of using within this state as a consumer any article of tangible personal property purchased at retail, or acquired by lease, gift, or bailment, or extracted or produced or manufactured by the person so using the same. . . ."

It will be seen that the respondents, as public-road contractors, were consumers. The only question remaining is whether they "used" the items.

RCW 82.12.010 reads in pertinent part:

"(2) 'Use,' 'used,' 'using,' or 'put to use' shall have their ordinary meaning, and shall mean the first act within this state by which the taxpayer takes or assumes dominion or control over the article of tangible personal property (as a consumer), and include installation, storage, withdrawal from storage, or any other act preparatory to subsequent actual use or consumption within this state;"

By the definition, to store an article (as a consumer) or to withdraw it from storage is a "use" of it. According to the evidence, the respondents performed these and other acts of dominion over the articles, and actually installed about half of the pontoons and anchors. According to the statutory definitions, therefore, the taxable incidents had occurred; that is, the respondents had used the articles, as consumers, in the business of constructing a public bridge, and the respondents became liable for the tax, even though the final installation was done by another contractor.

The respondents urge that RCW 82.04.190 is invalid because it discriminates between public-road contractors and other general contractors. There is a factual difference between these contractors, in that one group contracts with public bodies for a specific class of construction work, while the other does not. The respondents do not deny that the legislation applies alike to all within the class, but contends that no reasonable ground exists for making a distinction between those who fall within the class and those who do not. As we said in *Texas Co. v. Cohn*, 8 Wn. (2d) 360, 112 P. (2d) 522, a state legislature has very broad discretion in making classifications in the exercise of its taxing powers, and the differences between the classifications need not be

great. If they are substantial, the classification must be sustained.

Of course, the duty is upon the respondents to show that the classification is arbitrary. This they have not done.

The trial court made no finding on the value of the articles in question. The cause is therefore reversed and remanded with instructions to determine whether the respondents have sustained the burden of showing that the valuation arrived at by the tax commissioner was incorrect, in accordance with RCW 82.32.180.

FINLEY, HUNTER, HAMILTON, and HALE, JJ., and MURRAY, J. Pro Tem., concur.

HILL and DONWORTH, JJ., and OTT, C. J. (dissenting)—We dissent. We agree with the trial court that where contractors partially constructed, according to the state's minute specifications, huge pontoons and anchor shells intended for use in the Hood Canal Bridge, concededly an integral part of the state's highway system, using their own forces and materials, there is no logical or factual reason why such activities should be termed "manufacturing" and taxed as such.

Circumstances demonstrated that these partially constructed pontoons and anchor shells could not be used, as designed. There is nothing to indicate that these "orphans of the storm" constituted a "new, different or useful article of tangible personal property" nor were they a "substance of trade or commerce," within the purview of RCW 82.04.120, and hence not subject to the manufacturer's tax as levied by RCW 82.04.240.

As a "Public Road Contractor" the contractors here could only be liable to a claim for a manufacturing tax, if a "consumer" under RCW 82.04.190(3), "in respect, however, only to tangible personal property used or consumed in such business." And under RCW 82.12.020 they could only be held liable for a compensating or use tax as to the use within the state "as a consumer" of the manufactured product.

In its memorandum opinion, the trial court said:

"Plaintiffs contracted to construct a bridge known as the Hood Canal Bridge. Plaintiffs never built the bridge for

reasons which are too well known to require discussion here. Under the unusual and nearly unique facts of this case the plaintiffs were not 'consumers' as that term is defined in R.C.W. 82.04.190 in that they the plaintiffs did not 'use' or 'Consume' the pontoons and anchors. While it may well be that the pontoons and anchors were eventually 'used or consumed' in the building of the bridge, it was not by these plaintiffs. . . ."

His logic seems, to us, inescapable.

The trial court correctly determined that the respondents were not engaged in "manufacturing" and that they were not "consumers" of the partially constructed pontoons and anchor shells. We would affirm the trial court.

---

May 26, 1964. Petition for rehearing denied.